FILED

JUN 05 2012

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | ) BAP Nos. EW-11-1524-DHPa |
| | ) EW-11-1550-DHPa |
| LLS AMERICA, LLC, | ) (Related Appeals) |
| | ) |
| Debtor. | ) Bk. No. 09-06194-PCW11 |
| _____ | ) |
| | ) |
| TEAM SPIRIT AMERICA, LLC, | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) **M E M O R A N D U M**[1] |
| | ) |
| BRUCE PETER KRIEGMAN, Chapter 11 | ) |
| Trustee, | ) |
| | ) |
| Appellee. | ) |
| _____ | ) |
| | ) |
| D&D AND ASSOCIATES, | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| BRUCE PETER KRIEGMAN, Chapter 11 | ) |
| Trustee, | ) |
| | ) |
| Appellee. | ) |
| _____ | ) |

Argued and Submitted on May 16, 2012
at Pasadena, California

Filed - June 5, 2012

_____

[1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

1

Appeal from the United States Bankruptcy Court
for the Eastern District of Washington

Honorable Patricia C. Williams, Bankruptcy Judge, Presiding

_____

Appearances:

BAP Case No. EW-11-1524: Conrad C. Lysiak, Esq. argued for the Appellant, Team Spirit America, LLC. Daniel J. Gibbons, Esq., of Witherspoon Kelley argued for the Appellee, Bruce Peter Kriegman, Chapter 11 Trustee.

BAP Case No. EW-11-1550: Michael Joseph Beyer, Esq. argued for the Appellant, D&D and Associates; Daniel J. Gibbons, Esq., of Witherspoon Kelley argued for the Appellee, Bruce Peter Kriegman, Chapter 11 Trustee.

_____

Before: DUNN, HOLLOWELL, and PAPPAS, Bankruptcy Judges.

Without an evidentiary hearing, the bankruptcy court, applying the standards set forth in In re Bonham, 229 F.3d 750 (9th Cir. 2000), ordered the substantive consolidation of chapter 11[2] debtor, **LLS America, LLC** ("**LLS America**") (1) with chapter 11 debtor **D&D and Associates, LLC** ("**D&D**"), and (2) with numerous non-debtor entities,[3]

_____

[2] Unless otherwise specified, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure are referred to as "Civil Rules."

[3] The order granting substantive consolidation applies to the following entities: TSA; LLS Canada, LLC; Little Loan Shoppe America, LLC; Little Loan Shoppe Ltd.; 639504BC Ltd.; Little Loan Shoppe Canada, LLC; 0738106BC, Ltd.; 0738116BC, Ltd.; 0738126BC, Ltd.; 360 Northwest Networks, LLC; and LLS North America, LLC (collectively referred to as the "Non-Debtor Companies"). It also applies to D&D. We bold the references to the entities that are

(continued...)

including **Team Spirit America, LLC** ("**TSA**"). **TSA** and **D&D** filed separate appeals.[4] We AFFIRM.

## I. FACTS

The "Little Loan Shoppe" Consumer Loan Business

In September 1997, Doris Nelson ("Doris") opened a payday loan store, **Little Loan Shoppe, Ltd.**, in Abbotsford, British Columbia, Canada. By 1999, Doris had opened three other stores in the Fraser Valley of British Columbia.

Although Doris moved to Spokane, Washington in 2001, she continued to operate three payday loan stores in Canada. In 2002, Doris opened a new business, **639504BC Ltd.**, dba Little Loan Shoppe, to take telephone loan applications in Canada for Canadian customers. Doris thereafter closed the payday loan stores in Canada. In 2005, Doris registered **Little Loan Shoppe Canada, LLC** in Nevada for the purpose of conducting the Canadian telephone loan business. After the Canadian loan business expanded to the internet in 2006, **LLS Canada, LLC** was registered in Nevada to conduct the telephone and internet loan business in Canada. The Canadian

---

[3](...continued)
subject to the substantive consolidation order in an effort to aid the reader in separating them from other entities that are not.

The other entities not subject to substantive consolidation are numerous. Four are identified by name in the record. In addition, there are 42 Nevada companies and 25 Utah companies formed in 2008 for future business needs that never have been "activated."

[4] Mr. Beyer's employment as bankruptcy counsel for chapter 11 debtor **D&D** never was approved by the bankruptcy court. Nevertheless he filed and argued this appeal on behalf of **D&D**.

3

consumer loan business ended in June 2009.[5]

In late 2001, Doris opened the first of three payday loan stores she would eventually operate in Spokane under the name **Little Loan Shoppe America, LLC**. In November 2005, Doris registered **LLS America, LLC**, to conduct telephone and internet lending in the United States.

**Team Spirit America, LLC** ("**TSA**") was formed in June 2006. It is a Washington limited liability company solely owned by Doris. **TSA** began operations in August 2006 to perform all administrative and call center functions for the consumer loan business in the United States (**LLS America)** and in Canada (**LLS Canada**). **TSA** provided the following operating services: employing and paying all employees who perform the work of the consumer loan business; purchasing and paying for all supplies, utilities, and services; performing the accounting function; owning the business equipment; and holding unspecified software licenses.[6] **TSA** charged **LLS America** and **LLS Canada** for all services, allocated between them based on the relative number of loans each generated. However, **LLS Canada** did

[5]   It appears that both the Canadian business and the U.S. business maintained their banking relationships with Wells Fargo Bank. After Wells Fargo Bank changed the way it processed ACH debits to collect payments from consumer borrowers, the banking transactions with Wells Fargo Bank terminated. The U.S. business(es) moved all accounts to U.S. Bank. Because U.S. Bank was not able to process ACH debits in bank accounts in Canada, the Canadian consumer loan business ceased.

[6]   **TSA** performed the same services for the Canadian business until the Canadian business terminated in 2009.

4

not pay for its share of the **TSA** operating costs.  Instead, **LLS America** paid all **TSA** costs, either by paying vendors directly or otherwise transferring sufficient cash to **TSA** to pay the operating costs for both **LLS America** and **LLS Canada**.

In October 2009, **TSA** and **LLS America** entered into a Service Agreement, the validity of which is in dispute.  See infra.

The store front businesses were expensive to operate.  In 1999, Doris began funding **Little Loan Shoppe, Ltd.** with small loans from individuals.  By 2005, Doris began financing both the Canadian telephone loan business and the Spokane payday loan business through significant loans from a large number of individuals, referred to by the parties as the "Lenders."

For each Lenders loan, Doris executed a promissory note ("Notes") as the managing member for the limited liability company ("LLCs") to which the loan was extended.  The record reflects a sampling of the various LLCs to which funds were advanced, including **0738126BC Ltd.**; LLS America; **0738106BC Ltd.**; Atlantic LLS, LLC; Pacific LLS, LLC; LLS-A, LLC; and **Little Loan Shoppe America, LLC**.  Significantly, each Note contained language authorizing the use of funds by "any associated company."  The quid pro quo for the broad authority for the use of funds was broad liability:

> Parties agree that this money may be used by **Little Loan Shoppe America, LLC** in [**LLS America**] or in any other company that may be established from time to time and that all of such companies including those that are not herein listed are automatically included in the liability for such note.

In the case of some Notes, there was no express concession of

5

liability, merely a disclosure that the funds were at Doris' disposal in the operation of her business: "The undersigned hereby warrants that this money is being borrowed for business purposes for LLS-A, LLC and any associated company controlled by Doris Elizabeth Nelson."

The Primary Bankruptcy Case

The proceedings at issue in these appeals commenced on July 10, 2009, when some of the Lenders filed a chapter 11 involuntary petition in the Eastern District of Washington against one of Doris' companies, LLS-A, LLC ("LLS-A"). In response to the LLS-A involuntary petition, **LLS America** filed a voluntary chapter 11 petition in the District of Nevada on July 21, 2009.[7] The **LLS America** case is the primary bankruptcy case in the appeals before the Panel.

---

[7] The voluntary petition filed to initiate the **LLS America** case reflects that the involuntary petition had been filed against LLS-A, an affiliate of **LLS America**, in the Eastern District of Washington, on July 10, 2009 (09-03910-PCW). An order for relief was entered in the LLS-A chapter 11 case on August 12, 2009. Nothing substantive has occurred in the LLS-A case. Various minute entries on the docket reflect that LLS-A was not operating, and that the parties were waiting to see what developed in the **LLS America** case before proceeding in the LLS-A case. Because of the lack of progress in the LLS-A case, the LLS-A chapter 11 case was dismissed May 15 2012 on the motion of the United States Trustee ("U.S. Trustee"). Little of this background is in the Excerpts of Record provided by the parties to these appeals. We therefore reviewed the bankruptcy court's dockets as we are authorized to do in order to sort out the interrelationships of the proceedings. See O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.), 887 F.2d 955, 957-58 (9th Cir. 1989); Atwood v. Chase Manhattan Mortg. Co. (In re Atwood), 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

**LLS America's** Schedule F - Creditors Holding Unsecured Nonpriority Claims, filed with the petition, consisted of 277 pages listing creditors. The claim for each creditor was scheduled as "disputed" and, except for approximately twenty of those scheduled creditors, the amount for each claim was scheduled as "unknown." The dollar amount for the remaining twenty unsecured claims aggregated to $24,013,837.29. With the exception of a substantial disputed claim owed to Wells Fargo Bank, the unsecured claims arise from the Notes for loans nominally made to **LLS America,** LLS-A, and/or other related entities. Central to this appeal is the language of the Notes which raises substantial issues as to the identity of the borrower(s).

On October 22, 2009, the **LLS America** case was transferred to the Eastern District of Washington on the motion of some of the LLS-A petitioning creditors, who also were creditors in the **LLS America** case. The LLS-A petitioning creditors then sought the appointment of a chapter 11 trustee in the **LLS America** case. Their motion was resolved by the appointment of an examiner ("Examiner") in the **LLS America** case on the joint motion of **LLS America** and the Official Committee of Unsecured Creditors ("Creditors' Committee").[8]

The Examiner's charge was

---

[8] While the **LLS America** case still was pending in the District of Nevada, the U.S. Trustee appointed the Creditors' Committee, which included two of the LLS-A petitioning creditors. The attorneys for the LLS-A petitioning creditors later were appointed as attorneys for the Creditors' Committee in the **LLS America** case.

7

5. ... to investigate the acts, conduct, assets, liabilities, and financial condition of [**LLS America**], including but not limited to:

    a. sales or transfers of assets and any related transactions between [**LLS America**] and any affiliate or insider as those terms are defined in 11 U.S.C. § 101(2) and (31);

    b. any transfer or transaction involving [**LLS America**] and any insider, affiliate, or member of management of [**LLS America**] which was improper or a misappropriation of funds of [**LLS America**]; and

    c. [**LLS America's**] present financial operations and business model to determine if the business model is profitable and to analyze the profitability of the business on a go-forward basis.

6. ... to investigate the current management of [**LLS America**] and whether such management can be relied upon to maintain business operations, act as a fiduciary to the creditors, and formulate, propose, and implement a plan of reorganization which will include taking appropriate legal action against appropriate parties for the benefit of the estate;

7. ... to investigate and report on any transactions involving [**LLS America**] and any companies affiliated with [**LLS America**], including, but not limited to [**Team Spirit**] and Global Edge Marketing;

8. ... to investigate and report on transactions involving [**LLS America**] and any insider as defined in § 101(31). . . .

The Examiner issued his preliminary report ("Preliminary Report") on May 17, 2010,[9] after which the U.S. Trustee filed its own motion for the appointment of a chapter 11 trustee. Ultimately, on April 7, 2011, the bankruptcy court, with the agreement of **LLS America**, the Creditors' Committee, and the U.S. Trustee, directed

---

[9] In addition to the Preliminary Report, the Examiner filed his first interim report ("First Interim Report") on August 12, 2010 and his second interim report ("Second Interim Report") on February 9, 2011.

the U.S. Trustee to appoint a chapter 11 trustee in the **LLS America** case. Bruce Kriegman was appointed as the chapter 11 trustee ("Trustee") on April 18, 2011, and the bankruptcy court approved the Trustee's appointment on April 21, 2011.

In his reports, the Examiner determined that during the six-month period prior to the commencement of the **LLS America** bankruptcy case:

> [M]ost of the operating cash generated by **LLS America** was transferred to **TSA** without regard to the monthly cost of services provided to **LLS America** by **TSA**. Additionally, cash was transferred monthly from **LLS America** to **LLS Canada** to cover any cash shortfall arising out of the operation of **LLS Canada**. Cash transfers were made frequently and in varying amounts and, in most cases, without regard to any particular transaction.

First Interim Report at p. 11. Based on this reality, the Examiner reported that "[f]rom a cash utilization point of view, these three entities [**LLS America**, **TSA**, and **LLS Canada**] were treated as a single entity during the period." Id. In addition, **LLS America** transferred cash to **LLS Canada** "as necessary to cover the amounts paid to Lenders by **LLS Canada**." Id. at p. 12.

Relying upon the Examiner's reports, on June 30, 2011, the Trustee filed a motion to consolidate ("Substantive Consolidation Motion") the **LLS America** case with (1) the chapter 11 case of **D&D**, and (2) numerous Non-Debtor Companies, including **TSA**. The Substantive Consolidation Motion was premised on the assertions that **LLS America**, **D&D**, and the Non-Debtor Companies were operating a single enterprise, i.e., a consumer loan business, the Little Loan Shoppe, and that most of the claims in the **LLS America** case were

9

loans made to facilitate that consumer loan business.

The Consolidated Entities

**D&D** and the Office Building

**LLS America** and **TSA** conducted their business operations from a building ("Office Building") located on W. Broadway Street in Spokane. **D&D** purchased the Office Building in August 2006 for the purchase price of $650,000. **D&D** is solely owned by Doris' husband, Dennis Nelson.

To facilitate **D&D's** purchase of the Office Building, Doris withdrew funds from **LLS America** and **TSA**, and loaned the funds to **D&D.** When the building later was renovated, **LLS America** paid the $500,462 renovation costs. Between August 2006 and June 2009, rent to **D&D** was overpaid by $408,764.

Notwithstanding **D&D**'s ostensible ownership of the Office Building, on December 20, 2006, Doris informed the Lenders of the Little Loan Shoppe's purchase and proposed renovation of the Office Building:

> "Little Loan Shoppe" recently bought the building we were renting in Spokane, Washington. We are currently in the middle of an extensive remodeling project. Once this is complete we intend to schedule a grand opening. I want to invite all of you to come for this event! I would like to be able to thank you personally for the support and trust you have displayed both in me and the company while we were going through our growing stages. I will keep you posted on the dates of the opening so you can plan accordingly.

In 2009, Michael Schneider and certain other Lenders who had extended loans to Doris' business in the approximate aggregate of $885,000 (collectively "Schneider Creditors"), sued **D&D** in state

10

court, asserting that **D&D** had benefitted from the money loaned either as a partner of the Little Loan Shoppe business or as its affiliate. On November 16, 2010, the state court issued an opinion finding that (1) Doris had used the Lenders' funds both to purchase and to renovate the Office Building, and (2) rental funds generated by the Office Building were at times deposited into the joint personal checking account of Doris and Dennis rather than into **D&D**'s account. In light of the language in the Notes authorizing Doris to use the funds loaned in any associated company she controlled, the state court held that **D&D** was in effect an agent or partner of Doris and therefore responsible for repayment of the Notes.

**D&D** filed its voluntary chapter 11 petition in the Eastern District of Washington (Case No. 11-00785-FLK11) on February 21, 2011, to prevent entry of a judgment on the state court's opinion, which the Schneider Creditors could then have used to execute against the Office Building. The Schneider Creditors filed a motion for relief from the automatic stay in the **D&D** bankruptcy case ("Schneider RFS Motion") to allow them to seek entry of a judgment on **D&D**'s liability on their Notes and to pursue a judgment for damages. The Trustee objected to the Schneider RFS Motion. No hearing ever was scheduled on the Schneider RFS Motion.[10]

---

[10] The order granting substantive consolidation was entered on the docket in the D&D case on September 8, 2011. Thereafter, other than **D&D**'s request for entry of an order authorizing employment of its attorney, and the Trustee's objection thereto, nothing further is on the **D&D** docket.

11

The Non-Debtor Companies and Peripheral Services

In addition to **TSA**, which provided operating services to **LLS America**, the following Non-Debtor Companies provided peripheral services or support to the Little Loan Shoppe business.

Business Leads

Until 2006, **LLS America** generated business primarily through advertising on Google. In 2006, **LLS America** began purchasing loan leads from other providers. In May 2008, Doris formed Global Edge Marketing, LLC dba Adworkz ("GEM"), which was used to generate additional consumer loan leads through an advertising strategy that created fictitious store fronts on Google maps. Start-up funding for GEM came from **TSA** in the form of equipment and services. None of those funds had been repaid as of May 19, 2010. GEM is owned by D&C Lead Marketing, LLC, which is owned 59% by Dennis, 35% by Doris' son, Alex Foster, and 6% by Evan Ernst. GEM charges **LLS America** $85.00 for each lead; approximately 60% of those leads translate into loans. GEM provides services to other businesses as well. In 2010, less that 34% of GEM's gross revenue came from providing leads to **LLS America**.

License and Copyright

Doris is the sole owner of **LLS North America LLC**, formed in 2005. Its assets are limited to (1) the software license for the TRAN system (the software which enabled full consumer loan processing to be conducted on the internet), and (2) the copyright for the name "Little Loan Shoppe."

Internet Service Provider

**360 NW Networks, LLC** is owned by Dennis.  Its sole function is to act as the internet service provider that hosts the network address for **LLS America**.  Although it at one time had its own bank account, at the time of the Examiner's investigation prior to the issuance of the Preliminary Report, the account had been closed.

**0738106BC, Ltd.**, **0738116BC, Ltd.**, and **0738126BC, Ltd.**

Three companies were licensed in Canada in the fall of 2005 for the purpose of making payments to the Lenders, and to pay certain expenses of the consumer loan business in Canada:  **0738106BC, Ltd.**, **0738116BC, Ltd.**, and **0738126BC, Ltd.**

Proceedings on the Substantive Consolidation Motion

The Schneider Creditors objected to the consolidation of the **D&D** bankruptcy case with that of **LLS America**.  The Schneider Creditors also requested ("Continuance Motion") that the hearing on the Substantive Consolidation Motion be continued for a period of 45 days to permit discovery and the scheduling of an evidentiary hearing on the Substantive Consolidation Motion.  **D&D** filed its own objection to the substantive consolidation of its case with the **LLS America** case, but did not request a continuance or an evidentiary hearing with respect to the Substantive Consolidation Motion.  **TSA** filed (1) an objection[11] to the Substantive Consolidation Motion,

---

[11] The same attorney who filed the **TSA** Objection also filed objections on behalf of the following related entities: **LLS Canada**, **Little Loan Shoppe America, LLC**, **Little Loan Shoppe, Ltd.**, **639504BC Ltd.**, **Little Loan Shoppe Canada, LLC fka LLS Ltd.**, **0738106BC Ltd.**,
(continued...)

13

and (2) a "joinder" to the Continuance Motion.

The bankruptcy court denied the Continuance Motion at the hearing held August 9, 2011 ("August 9 Hearing"), and proceeded to hear argument on the Substantive Consolidation Motion at that time. At the conclusion of the August 9 Hearing, the bankruptcy court orally granted the Substantive Consolidation Motion. Hearings on the form of orders were held August 26, 2011 ("August 26 Hearing") and August 29, 2011 ("August 29 Hearing"). The bankruptcy court thereafter entered its order denying the Continuance Motion ("Continuance Order") on September 1, 2011, and its order granting the Substantive Consolidation Motion ("Substantive Consolidation Order") on September 8, 2011.

**TSA** filed a timely notice of appeal on September 21, 2011 (#835). **D&D** also filed a notice of appeal on September 30, 2011 (#918).[12] The Schneider Creditors did not appeal the bankruptcy court's orders at issue before us.

## II.  JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C.

---

[11](...continued)
**0738126BC Ltd.**, **LLS North America, LLC**, **0738116BC Ltd.** Because the objections of these related entities were not addressed at the hearing on the Substantive Consolidation Motion and because no appeal has been taken by any of the related entities, we deem these objections to have been waived.

[12]  The **D&D** appeal is timely pursuant to Rule 8002(a):  "If a timely notice of appeal is filed by a party, any other party may file a notice of appeal within 14 days of the date on which the first notice of appeal was filed, or within the time otherwise prescribed by this rule, whichever period last expires."

14

§§ 157(b)(1) and (b)(2)(A) and (O). We have jurisdiction under 28 U.S.C. § 158.

III. ISSUES

Whether the bankruptcy court abused its discretion when it denied the Continuance Motion.

Whether the bankruptcy court abused its discretion when it failed to conduct an evidentiary hearing on the Substantive Consolidation Motion.

Whether the bankruptcy court erred when it ordered the substantive consolidation of **D&D** with **LLS America**. Whether the bankruptcy court erred when it ordered the substantive consolidation of the Non-Debtor Companies with **LLS America**.

IV. STANDARDS OF REVIEW

A decision to deny a request for continuance is reviewed for abuse of discretion. <u>Orr v. Bank of Am.</u>, 285 F.3d 764, 783 (9th Cir. 2002). A bankruptcy court's decision whether to hold an evidentiary hearing also is reviewed for an abuse of discretion. <u>Zurich Am. Ins. Co. v. Int'l Fibercom, Inc. (In re Int'l Fibercom, Inc.)</u>, 503 F.3d 933, 939 (9th Cir. 2007).

We apply a two-part test to determine whether the bankruptcy court abused its discretion. <u>United States v. Hinkson</u>, 585 F.3d 1247, 1261-62 (9th Cir. 2009)(en banc). First, we consider de novo whether the bankruptcy court applied the correct legal standard to the relief requested. <u>Id.</u> Then, we review the bankruptcy court's fact findings for clear error. <u>Id.</u> at 1262 & n.20. We must affirm the bankruptcy court's fact findings unless we conclude that they

15

are "(1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" Id. at 1262.

Under the abuse of discretion standard, we must have a definite and firm conviction that the bankruptcy court committed a clear error of judgment in the conclusion it reached before reversal is appropriate. Hopkins v. Cerchione (In re Cerchione), 414 B.R. 540, 545 (9th Cir. BAP 2009).

A mixed question exists when the facts are established, the rule of law is undisputed, and the issue is whether the facts satisfy the legal rule. Murray v. Bammer (In re Bammer), 131 F.3d 788, 792 (9th Cir. 1997). Mixed questions require consideration of legal concepts and the exercise of judgment about the values that animate legal principles. Id. We review mixed questions of law and fact de novo. Wechsler v. Macke Int'l Trade, Inc. (In re Macke Int'l Trade, Inc.), 370 B.R. 236, 245 (9th Cir. BAP 2007).

De novo means review is independent, with no deference given to the trial court's conclusion. See First Ave. W. Bldg., LLC v. James (In re Onecast Media, Inc.), 439 F.3d 558, 561 (9th Cir. 2006).

In this case, the "rule of law" is articulated by the Ninth Circuit's decision in Alexander v. Compton (In re Bonham), 229 F.3d 750 (9th Cir. 2000). We therefore must determine whether the facts support substantive consolidation as ordered by the bankruptcy court. We may affirm the bankruptcy court on any ground supported by the record. Olsen v. Idaho State Bd. of Med., 363 F.3d 916, 922 (9th Cir. 2004).

V.  DISCUSSION

I.  The Bankruptcy Court Did Not Abuse Its Discretion When It Did Not Continue the Hearing On the Substantive Consolidation Motion.

A.  The Continuance Motion

The Schneider Creditors, as creditors of **D&D** who opposed substantively consolidating the **D&D** bankruptcy case with that of **LLS America**, filed the Continuance Motion asserting that they needed an additional forty-five days to conduct discovery for an evidentiary hearing on the Substantive Consolidation Motion.  The bankruptcy court ruled that the Schneider Creditors were judicially estopped from opposing the Substantive Consolidation Motion based upon their contrary position, upon which they prevailed, taken before the state court, i.e., that **D&D** was liable on the Notes issued by **LLS America** and other related entities.  Because the Schneider Creditors were estopped from opposing the Substantive Consolidation Motion, the bankruptcy court ruled that no additional discovery was necessary and denied the Continuance Motion.

The Schneider Creditors have not appealed the Continuance Order (or the Substantive Consolidation Order).  Instead, **D&D** filed the appeal.  In its opening brief, **D&D** states "**D&D** also requested a continuance [sic] hearing or trial so that discovery could be conducted with respect to the proposed consolidation."  **D&D** Opening Brief on Appeal at 8:12-14.  This is patently untrue.  **D&D** cites to its excerpts of record in support of this statement.  However, the pleading to which it cites is not a pleading filed by **D&D** but rather the Continuance Motion filed by the Schneider Creditors, on their

17

own behalf.  Having not sought a continuance from the bankruptcy court, **D&D** cannot complain on appeal that one was not granted to it.

B.  **TSA's** Joinder in the Continuance Motion

**TSA** did not file an independent motion for a continuance of the hearing on the Substantive Consolidation Motion.  Instead, it filed a "joinder," which stated in its entirety:  "[**TSA**], a party in interest herein, hereby joins the motion for continuance filed . . . on behalf of [the Schneider Creditors].  This joinder is based upon the records and files herein and upon the Affidavit of Conrad C. Lysiak filed herewith."  The Affidavit of Conrad C. Lysiak stated only that **TSA** believed that it should be given forty-five days to conduct reasonable discovery in order to determine the factual and legal basis for the Substantive Consolidation Motion.

In denying the Continuance Motion as to **TSA**, the bankruptcy court determined that the only discovery sought by **TSA** appeared to be evidence of transfers between **LLS America** and **TSA**.  The bankruptcy court was unpersuaded that **TSA** required additional discovery with respect to those transfers where (1) the Examiner's reports, submitted as evidence in support of the Substantive Consolidation Motion, contained specifics about those transfers, and (2) **TSA** had taken no steps to take the deposition of the Examiner in an effort to dispute the Examiner's findings during the year in which the Examiner was investigating the relationship between **TSA** and **LLS America**.

On the record before us, we cannot say that the bankruptcy court abused its discretion when it denied the Continuance Motion as

18

to **TSA,** based upon those factual determinations. No clear error has been demonstrated.

II. The Bankruptcy Court Did Not Abuse Its Discretion When It Did Not Conduct an Evidentiary Hearing On the Substantive Consolidation Motion.

**D&D** asserts on appeal that the bankruptcy court abused its discretion when it failed to conduct an evidentiary hearing on the Substantive Consolidation Motion. In its opening brief, **D&D** states that in the Continuance Order, the bankruptcy court determined that there was no need for an evidentiary hearing as requested by **D&D**. **D&D** Opening Brief at 9:1-3. However, nowhere in the order does the bankruptcy court refer to an evidentiary hearing having been requested by **D&D**, and as we discussed above, **D&D** did not request an evidentiary hearing.

Further, it is disingenuous of **D&D** to represent to the Panel that it somehow was harmed by the bankruptcy court's failure to conduct an evidentiary hearing. **D&D's** objection to the Substantive Consolidation Motion was "based on the fact, but not limited to [sic], that [**D&D**] is not an affiliate of [**LLS America**] as defined by 11 USC § 101(2), its members are not the same, nor are it's [sic] assets or liabilities the same as [**LLS America**]." Counsel for **D&D** appeared at the August 9 Hearing and was provided an opportunity to argue. The full presentation of **D&D's** case on the Substantive Consolidation Motion was as follows:

Okay. My objection is the fact that, first of all, I represent the **D&D** estate. **D&D** filed [its] chapter 11 to prevent the possible entry of an order, which would then cause execution against the sole asset of **D&D**, which is in fact a building on West Broadway. Although, I would agree

19

that the state court found that there might be liability of **D&D** on the notes, I don't think the court at the state court level, and this is my argument, nor under the Bankruptcy Code, under section 101(2), that **D&D** is in fact an affiliate as defined.

If you look at that the – the entity, LLS, Little Loan Shop doesn't directly own or control any power to vote on **D&D**. **D&D** is solely owned by Dennis Nelson, not by Ms. Nelson.

**LLS America** doesn't own any stock or any securities. It's – there's no fiduciary or agency. There's no debt secured by **D&D** to LL- LLS. And, in fact as Mr. Lysiak pointed out, **D&D** never produced any notes, **D&D** never executed any notes, **D&D** never collected on any notes. The only purpose that **D&D** was that it operated as a building to provide office space for Team America [sic].

I don't believe it is considered an entity, and in fact, the trustee had an emergency motion not too long ago in front of Judge Kurtz, who **D&D** actually was assigned, so that they could file a complaint, a fairly substantial complaint alleging a number of things, such as preferences, fraudulent conveyances, unjust [enrichment], et cetera.

And it would be my argument that, not only are not we an affiliate, but if this motion to consolidate is allowed to occur, then **D&D** is brought into the fold and ipso facto they have no ability to defend itself, and the trustee's adversary case is already done and over with, because they now have **D&D**. So, that's why I'm opposing the motion, Your Honor.

Tr. of August 9 Hearing at 38:24-40:7.

Neither in its objection nor at the hearing on the Substantive Consolidation Motion did **D&D** assert that it had evidence to present or that it wanted the bankruptcy court to conduct an evidentiary hearing. By not making a request for an evidentiary hearing on the Substantive Consolidation Motion, as other parties had done, **D&D** waived its right to complain about the lack of an evidentiary hearing. It cannot now step into the shoes of the Schneider

20

Creditors and complain that the bankruptcy court abused its discretion in not granting them an evidentiary hearing.

Unlike **D&D**, **TSA** did request an evidentiary hearing. On appeal, **TSA** asserts that it was precluded from cross-examining the Examiner with respect to his reports. It now asserts that the reports are "replete with conflicting . . . statements that actually support the legal separateness of [**TSA**] and [**LLS America**]." However, **TSA** never advised the bankruptcy court that it wanted an opportunity to cross-examine the Examiner. In fact, it was the bankruptcy court that pointed out to **TSA's** counsel that **TSA** never had undertaken to challenge the Examiner or his reports, despite having had plenty of opportunity to do so. Moreover, in its objection to the Substantive Consolidation Motion, **TSA** relied nearly exclusively on the findings of the Examiner in his reports.

For the first time on appeal, **TSA** asserts that because substantive consolidation is "tantamount to an involuntary petition," **TSA** was entitled to the same protection offered by the provisions of § 303, which includes an evidentiary hearing. **TSA** did not raise this issue before the bankruptcy court, either in its objection to the Substantive Consolidation Motion, or in its joinder to the Continuance Motion. In its argument on the Substantive Consolidation Motion, **TSA** addressed only the legal standard for substantive consolidation set forth in <u>Bonham</u>. Moreover, at the subsequent hearings on the form of the order granting the Substantive Consolidation Motion, in response to the bankruptcy court's direct invitation for additional comment or argument on

21

substantive consolidation, **TSA**'s counsel declined:

> I have nothing to add, Your Honor.  You were patient last week when I made my arguments and there's nothing else to add.  Thank you.

Tr. of August 26 Hearing at 83:11-13.

> THE COURT:  Mr. Lysiak, I haven't heard from you.  Did you want to add anything to this?
>
> MR. LYSIAK:  No, I don't, Your Honor.  Thank You.

Tr. of August 29 Hearing at 115:5-7.

**TSA** did not inform the bankruptcy court that it claimed that it was entitled to an evidentiary hearing because substantive consolidation "is tantamount to an involuntary bankruptcy," thereby entitling **TSA** to the due process opportunities afforded through § 303.  Significantly, nothing in its presentation to the bankruptcy court on the merits of substantive consolidation suggests **TSA** ever informed the bankruptcy court that **TSA** believed the bankruptcy court was applying an incorrect rule of law, i.e., application of <u>Bonham</u> to determine whether substantive consolidation was appropriate versus application of § 303 standards to determine whether **TSA** was subject to an involuntary bankruptcy proceeding.  The failure to assert § 303 as a defense on the merits of the Substantive Consolidation Motion is a clear reflection that **TSA** never intended to prepare for an evidentiary hearing on § 303 issues.  **TSA** cannot now assert that the bankruptcy court abused its discretion in not holding an evidentiary hearing on that basis.[13]

---

[13]    The record reflects that the issue was raised by Doris'
(continued...)

22

In connection with the need for an evidentiary hearing, the bankruptcy court made the following finding:

> There is ample evidence in the record, including but not limited to, the evidence identified [previously in the order] for the Court to determine the [Substantive Consolidation Motion] without holding an evidentiary hearing. No party submitted any evidence or identified any evidence that controverted the factual or legal basis relied upon by the moving party in the [Substantive Consolidation Motion]. No party established existence of any additional evidence which would have controverted the factual or legal basis of the [Substantive Consolidation Motion].

Substantive Consolidation Order at 5:25-6:7.

Federal judges have discretion as to the method by which evidence is taken, including wholly by affidavit. See Civil Rule 43. Civil Rule 43 is applicable in bankruptcy cases pursuant to Rule 9017. In the Eastern District of Washington, LBR 9073-1 contemplates that parties will provide evidence by affidavit prior to the scheduled hearing. The version of LBR 9073-1 in effect at the time of the August 9 Hearing provides:

> (d) Filing of Documents to be Considered at Hearings
>
> (1) Except as provided in LBR 4001-2, an application or motion, supporting affidavits or statements under penalty of perjury shall be served and filed no later than seven (7) days prior to the hearing on an application or motion. An opposing party shall serve and file any objections, counter-affidavits or statements under penalty of perjury or other responding documents not later than three (3) days prior to the hearing on the application or motion.

---

[13](...continued)
attorney at the August 9 Hearing. However, the issue was not preserved for our review because Doris did not file an appeal in her own name. **TSA** cannot adopt on appeal a position asserted by another party to the proceedings, which that party has abandoned.

(2)  A document intended to be considered by the Court in connection with a scheduled hearing shall be served and filed in accordance with subparagraph (1) above.

Under these circumstances, we cannot say that the bankruptcy court abused its discretion when it determined it had an adequate record upon which to rule without an evidentiary hearing.

III.  The Bankruptcy Court Did Not Err When It Granted the Substantive Consolidation Motion.

"The primary purpose of substantive consolidation 'is to ensure the equitable treatment of all creditors.'"  Bonham, 229 F.3d at 764 (internal citation omitted).  It is well-settled under Ninth Circuit law that bankruptcy courts have the equitable authority to order the substantive consolidation (1) of a debtor's case with non-debtor entities, (2) nunc pro tunc.  See generally In re Bonham.  Our role is limited to a determination of whether, on the record before us, substantive consolidation is consistent with the rule of law set forth in Bonham.

Bonham authorizes a bankruptcy court to order the  substantive consolidation of entities if "(1) [] creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit; or (2) [] the affairs of the debtor are so entangled that consolidation will benefit all creditors."  Bonham, 229 F.3d at 766 (citation omitted, emphasis added).  These factors are considered in the disjunctive:  only one needs to be present to support substantive consolidation.  In this case, both factors are satisfied.

**D&D** contends that to satisfy the first factor, the bankruptcy

24

court was required to find that under Washington law, **D&D** was not a separate legal entity. It further contends that the record before the bankruptcy court was not sufficient to do so. We disagree as to **D&D's** premise. The first Bonham factor does not address an issue of law. Rather, it looks to the intent of the Lenders when the loans were made.

The record before us demonstrates that the Lenders, overwhelmingly the largest creditor body both in number and in dollar amount, "dealt with the entities as a single economic unit," the Little Loan Shoppe. Clear evidence in support of this factual determination is contained in the language of the Notes Doris signed when the loans were made. That language gave Doris unfettered use of the funds loaned with respect to any of her companies. In addition to the Notes, the state court's findings and the Examiner's reports all evidence the reality of the broad discretion Doris had in using the loaned funds.

As to the second Bonham factor, the state court findings establish preclusively that the affairs of **D&D** were entangled with **LLS America**, and with Dennis and Doris. Despite **D&D's** protestations to the contrary, its entanglement with the affairs of **LLS America** was pervasive. **LLS America**, **TSA**, and Doris provided the funds for **D&D** to purchase the Office Building. The monies flowing between and among the entities have no relationship either to the purported ownership of the Office Building by **D&D** or to any lease of the premises to **LLS America** and/or **TSA**.

**TSA** attempts to establish that its affairs are separate from

25

those of **LLS America** through the Service Agreement it entered into with **LLS America** dated October 23, 2009. Doris signed that Service Agreement wearing two hats, i.e., on behalf of each of the parties. Further, as the Trustee has pointed out, at the time Doris executed the agreement on behalf of **LLS America**, **LLS America** was a debtor-in-possession, incapable of entering into an agreement that was outside the ordinary course of its business, unless the agreement was subject to scrutiny by its creditors and approval by the bankruptcy court. See §§ 1108, 363(b). For purposes of this appeal, whether the Service Agreement is valid is not important. What is important is that Doris took steps to identify and define the financial relationship between **LLS America** and **TSA** only after the **LLS America** bankruptcy had been filed. Up to that point, the records available to the Examiner established that Doris treated **LLS America** and **TSA** (and **LLS Canada**) as a single entity from a cash utilization point of view.

We observe again that substantive consolidation is an equitable remedy available for the benefit of creditors. Notably, it is only Doris (through her solely-owned company, **TSA**) and Dennis (through his solely-owned company, **D&D**) who have appealed the Substantive Consolidation Order. No creditor has appealed.[14]

The record reflects both that the Lenders extended credit

[14] While the Schneider Creditors opposed the Substantive Consolidation Motion in the first instance, their motivation was to keep other Lenders from reaching the Office Building as an asset from which their claims might be satisfied.

26

generally to Doris and to the Little Loan Shoppe business, irrespective of the legal entity she created to conduct such business. The record also reflects that the financial affairs between and among Doris, Dennis, **LLS America**, **D&D**, and the Non-Debtor Companies were so entangled that all creditors are benefitted by the Substantive Consolidation Order.

VI.   CONCLUSION

On the facts before us, the bankruptcy court did not abuse its discretion when it denied the Continuance Motion or when it failed to conduct an evidentiary hearing on the Substantive Consolidation Motion. Under the <u>Bonham</u> factors, the bankruptcy court did not err when it entered the Substantive Consolidation Order. Accordingly, we AFFIRM.