**HCI INVESTORS, LLC, et al., Respondents,**

v.

**Anthony FOX, et al., Appellants.**

Nos. WD 75831, WD 75880.

Missouri Court of Appeals, Western District.

Oct. 8, 2013.

Charles W. German, Lawrence A. Rouse and Daniel B. Hodes, Kansas City, MO, for respondents.

John C. Aïsenbrey and Angela G. Nichols, Kansas City, MO, for appellants.

Before Division Three: LISA WHITE HARDWICK, Presiding Judge, MARK D. PFEIFFER, Judge and CYNTHIA L. MARTIN, Judge.

CYNTHIA L. MARTIN, Judge.

Limited liability companies ("LLCs") were formed to purchase nonperforming assets held by a bank holding company's subsidiary bank in order to remove the assets from the bank's books prior to an FDIC examination. Shareholders of the bank holding company who agreed to participate became members of the LLCs, obligated to make capital calls to fund the LLCs and to execute personal guarantees of loans obtained by the LLCs to acquire the nonperforming assets. The proposed

transaction anticipated that shareholders of the bank holding company who refused to participate would be subject to dilution of their share position by the issuance of warrants permitting participating shareholders to acquire additional stock at an inexpensive price. The Fox Family agreed to participate, and thus became members in the LLCs. The Fox Family later refused to pay capital calls made by the LLCs. The LLCs filed suit against the Fox Family to enforce the obligation to pay capital calls. The Fox Family asserted numerous affirmative defenses and counterclaims in response challenging the lawfulness and enforceability of the LLCs' operating agreements. Following trial to the court, a judgment was entered in favor of the LLCs and against the Fox Family on the LLCs claims. The judgment rejected all of the Fox Family's affirmative defenses and counterclaims.

The Fox Family appeals. We affirm.

## Factual and Procedural History[1]

Respondents HCI Investors, LLC, HB Investors LLC, and FFBWC Investors, LLC are limited liability companies duly organized and existing under the laws of Missouri (the "LLCs"). Jack Fingersh ("Fingersh") and Irwin Blitt ("Blitt") are managers of the LLCs. The LLCs were formed in 2008 to acquire nonperforming assets from Hillcrest Bancshares, Inc., a Kansas corporation, (the "Holding Company"), and its subsidiary Hillcrest Bank (the "Bank") in advance of an FDIC examination. Fingersh and Blitt are directors of the Holding Company and the Bank.

The Holding Company and the Bank were owned almost entirely by seven families:[2] the Fingersh Family (31.663%) (as to which Fingersh is the authorized representative), the Blitt Family (25.453%) (as to which Blitt is the authorized representative), the Copaken Family (10.321%) (as to which Paul Copaken is the authorized representative), the White Family (10.511%) (as to which Jerry White is the authorized representative), the Fox Family (14.71%) (as to which Shayle Fox ("Fox") is the authorized representative), and the Morgan and Dreiseszun Families (6.940%). These families had a thirty year history of being investment partners and had participated together in many ventures including commercial and residential real estate, and banks. The family representatives are each sophisticated businessmen. Fox is a CPA, and has been a business and commercial transactions attorney for over fifty years.

In 2008, in response to the virtual collapse of the real estate market, an increasing number of the Bank's borrowers were unable to make payments on loans secured by real estate. The ratio between these nonperforming assets ("NPAs") and total assets on the Bank's books had increased from at or below 1% to approximately 5%. The ratio was expected to increase to over 7%, a level the Bank's directors believed would have undesirable regulatory consequences at a looming FDIC examination scheduled in May 2008.

In an April 14, 2008 memorandum, Fingersh proposed that LLCs be formed to

---

1. "On appeal from a court-tried matter, we view the facts in the light most favorable to the court's judgment." *Short v. Southern Union Co.*, 372 S.W.3d 520, 524 n. 2 (Mo.App. W.D.2012).

2. These family interests were held through trusts and other entities as to which a particu-

lar family member was the duly authorized representative. The complexities of the family interest holdings and of the authority a particular family member had over the holdings are not at issue in this case, and need not be further explained.

acquire some of the Bank's NPAs, and that all Holding Company shareholders be given the opportunity to participate by agreeing to be members of the LLCs (the "Transaction"). LLC members would be bound by operating agreements to make capital calls to fund LLC obligations,[3] and would be required to personally guarantee LLC debt incurred to acquire the NPAs. The LLCs would then work to market and sell the acquired NPAs. The Transaction proposed issuing warrants to Holding Company shareholders who agreed to participate allowing them "on a pro rata basis and without additional consideration, to acquire stock [in the Holding Company] equal to 25% of the stock owned by the non-participating shareholder." The effect of the issuance of the warrants would be to dilute the share position of Holding Company shareholders who refused to participate in the Transaction. The warrant issuance was thus intended to incentivize participation so that nonparticipating shareholders would not unfairly benefit from the willingness of other shareholders to accept the risk of participation in the Transaction. There was a sense of urgency to the Transaction, as all Holding Company shareholders, including the Fox Family, agreed that doing nothing was not an option as it was essential to improve the Bank's NPA ratio in advance of the FDIC examination.

Operating agreements were presented to participating shareholders for signature in June 2008. All Holding Company shareholders except the Morgan and Dreiseszun Families agreed to participate in the Transaction. A separate agreement addressing the issuance of warrants was also executed in June 2008.

Following the execution of the LLC operating agreements, the LLCs were able to negotiate and close on loans in the approximate amount of $28,000,000 from North American Savings Bank and First State Bank. The members of the LLCs personally guaranteed the LLC loans. The loan proceeds were then combined with capital contributions from the LLC members to permit the acquisition of $40,700,000 of NPAs from the Bank.

Prior to the closing of the Transaction, the Holding Company had been advised by its outside accountants that the issuance of warrants to incentivize the Transaction would require a charge to the Bank's earnings of approximately $250,000. In December 2008, and thus a few months after the Transaction closed, the outside accountants advised the Holding Company that their calculation was in error, and that the issuance of the warrants would require an immediate charge to the Bank's earnings in the approximate amount of $2,500,000. The participating shareholders, including the Fox Family, unanimously agreed to cancel the warrants to avoid this undesirable impact on the Bank's earnings.

The LLCs made periodic capital calls to fund debt service and other costs associated with ownership and marketing of the acquired NPAs. The Fox Family honored all capital calls until September 2009. The Fox Family thereafter summarily announced they would no longer pay capital calls, and that they were no longer willing to participate in the LLCs. On July 30, 2010, the LLCs filed suit against the Fox Family for breach of contract seeking recovery of unpaid capital calls required by the operating agreements, and for a declaratory judgment that the Fox Family remained bound by the operating agreements.

3. The LLCs obligations were expected to include carrying costs for the acquired NPAs and debt servicing obligations for any loans incurred to acquire the NPAs.

The Fox Family answered the petition and asserted numerous affirmative defenses and counterclaims, all of which sought to negate the obligation to make the capital calls, and/or to declare the operating agreements unenforceable. The counterclaims sought rescission of the operating agreements, and asserted theories of fraudulent misrepresentation, negligent misrepresentation, breach of fiduciary duty, and violation of section 409.5–509 [4] against Fingersh in his capacity as the "promoter" of the LLCs.[5]

In December 2011, the Fox Family sought leave to file an amended answer to add an affirmative defense and a counterclaim asserting an additional theory of breach of fiduciary duty by Fingersh and Blitt in their capacities as directors and controlling shareholders of the Holding Company. Leave was granted in March 2012.

The case was tried to the court in June 2012. It was undisputed that the Fox Family failed to pay capital calls when demanded by the LLCs. On October 29, 2012, the trial court entered its judgment ("Judgment") finding: that the Fox Family had been in continuous breach of the operating agreements given the nonpayment of capital calls; that the LLCs are entitled to damages in the amount of $1,589,325.70, plus interest, plus attorneys' fees, and expenses in a combined total of $620,600.45; that the newly added counterclaim against Fingersh and Blitt for breach of fiduciary duty in their capacities as directors and controlling shareholders of the Holding Company was barred by the statute of limitations, but that the related affirmative defense was not time barred; that the Fox Family's remaining counterclaims and affirmative defenses (including the newly added affirmative defense asserting breach of fiduciary duty against Fingersh and Blitt) were without merit based upon the evidence presented; [6] and that the Fox Family remained a member of the LLCs bound by the operating agreements.

This appeal followed.

### Summary of Issues on Appeal

The Fox Family appeals only the trial court's rejection of the breach of fiduciary duty counterclaim and affirmative defense first asserted in March 2012 against Fingersh and Blitt in their capacities as directors and controlling shareholders of the Holding Company. The Fox Family asserts in their first point on appeal that the trial court erred in rejecting the affirmative defense and counterclaim because Fingersh and Blitt were self-dealing directors and shareholders who failed to sustain their burden to establish that the Transaction met the entire fairness standard. In their second point on appeal, the Fox Family asserts that the trial court erred in concluding that the counterclaim was barred by the applicable statute of limitations. In their third point on appeal, the Fox Family asserts that the trial court erred in concluding that the counterclaim was barred by the doctrines of waiver and ratification.[7] In their fourth point on ap-

---

**4.** All statutory references are to RSMo 2000 as supplemented unless otherwise indicated.

**5.** In December 2010, representatives of the non-breaching LLC member families were added as plaintiffs to the lawsuit.

**6.** In March 2012, the trial court granted partial summary judgment to the LLCs dismiss-

ing all affirmative defenses related to the "ultra vires" nature of the capital calls.

**7.** We do not agree with the premise of this point relied on, as our review of the Judgment does not indicate that the trial court rejected the breach of fiduciary duty counterclaim based on the doctrines of waiver and ratification. However, as we discuss herein, we

peal, the Fox Family asserts that the trial court erred in denying them a jury trial on the counterclaim.

We conclude that point one is without merit, as the weight of the evidence supports the trial court's rejection of the breach of fiduciary duty affirmative defense and related counterclaim, negating any need to address points two and three. We conclude that point four is without merit because the trial court correctly construed the jury waiver provision in the LLCs' operating agreements to apply to the breach of fiduciary duty counterclaim.

## Point I

The Fox Family claims that the trial court erred in denying the breach of fiduciary duty counterclaim and affirmative defense [8] first asserted in March 2012 because Fingersh and Blitt, as self-dealing and self-interested directors, did not satisfy their burden to prove the entire fairness of the Transaction by clear and satisfactory evidence. The Fox Family's combined discussion of the affirmative defense and counterclaim recognizes that the substantive allegations supporting each are materially indistinguishable, such that the defense and the claim relied for their proof on the same evidence.

### Standard of Review

"The judgment of the trial court will be affirmed 'unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law.'" *Pearson v. Koster,* 367 S.W.3d 36, 43 (Mo. banc 2012) (citing *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976)). "A claim that there is no substantial evidence to support the judgment or that the judgment is against the weight of the evidence necessarily involves review of the trial court's factual determinations." *Id.* "A court will overturn a trial court's judgment under these fact-based standards of review only when the court has a firm belief that the judgment is wrong." *Id.* "In reviewing questions of fact, the reviewing court will defer to the trial court's assessment of the evidence if any facts relevant to an issue are contested." *Id.* at 44. Once an issue is contested, "'a trial court is free to disbelieve any, all, or none of the evidence,' and 'the appellate court's role is not to reevaluate testimony through its own perspective.'" *Id.* (citation omitted). "We [thus] review the evidence in a light most favorable to the judgment, accept it as true, and disregard any contradictory evidence." *Soderholm v. Nauman,* 409 S.W.3d 382, 388 (Mo.App. W.D.2013).

### Analysis [9]

The Fox Family's Brief broadly complains about the Transaction. However, the Fox Family has appealed the Judgment's rejection of only a single affirma-

---

need not reach the merits of this point relied on in any event, as it is mooted by our disposition of the Fox Family's first point relied on.

8. At oral argument, the Respondents argued that the Fox Family's affirmative defense of breach of fiduciary duty was not truly a defense to the LLCs' effort to enforce the operating agreements because they lacked mutuality. However, the trial court found mutuality citing *Mynatt v. Collis,* 274 Kan. 850, 57 P.3d 513 (2002). Respondents did not cross-appeal this finding and, therefore, it is not addressed by this opinion.

9. The Fox Family contends that this point involves review of a mixed question of law and fact requiring deference to the trial court's factual findings but de novo review of whether those facts require application of the entire fairness test. Citing *Becker v. Knoll,* 291 Kan. 204, 239 P.3d 830, 836 (2010). We need not address this assertion, as we have assumed for purposes of our discussion that the trial court was required to apply the entire fairness test.

tive defense and related counterclaim. It is thus necessary to sort through the complaints about the Transaction espoused in the Brief to identify the precise manner in which the Fox Family contends that Fingersh and Blitt breached their fiduciary duties as directors and controlling shareholders in the Holding Company.

The record reflects that the Fox Family agreed that it was essential for the directors of the Holding Company to take action to remediate the Bank's NPA ratio in advance of the FDIC examination. The Fox Family agreed that Fingersh's proposal to form LLCs to acquire NPAs from the Bank was appropriate, and that it was appropriate to invite all Holding Company shareholders to participate in the Transaction. The Fox Family agreed that it was appropriate to incentivize shareholder participation by attaching a consequence to a shareholder's decision not to participate. The Fox Family agreed that the issuance of warrants to participating shareholders that would dilute the share position of nonparticipating shareholders was an appropriate incentive. For purposes of the breach of fiduciary duty allegations, the Fox Family's singular quarrel with the structure of the Transaction was the *percentage* of warrants authorized.[10] Fingersh and Blitt (as directors and controlling shareholders of the Holding Company) decided to permit the issuance of warrants to acquire stock in the Holding Company equal to 25% of the stock owned by the non-participating shareholder. According to the Fox Family, this percentage bore no relationship to the risk the shareholders were being asked to undertake by participating in the Transaction. According to the Fox Family, because dilution of their share position in the Holding Company by 25% would result in a loss of at least $5,500,000 in share value, they had no choice but to participate in the LLCs where they believed their financial exposure would be limited to $2,400,000.[11] The Fox Family contends that because Fingersh and Blitt were self-dealing when they decided to issue warrants in the amount of 25% of nonparticipating shareholder's shares, they bear the burden to establish by clear and satisfactory evidence that their decision met the entire fairness standard.

The trial court concluded that directors are generally "given the benefit of what is known as the business judgment rule," and that here, "[t]o the extent that the business judgment rule would apply, the Court would certainly conclude that the directors' actions fell within the protections of the business judgment rule." The Fox Family does not challenge this conclusion.

However, the trial court also concluded that the business judgment rule is not applicable "in situations in which the directors have a specialized interest in the transaction, where they're on both sides of the transaction, and where it involves mi-

---

10. The Fox Family's attorney confirmed during oral argument that the need for the Transaction, and the structure of the Transaction, were acceptable to the Fox Family, and that the basis for the claim of breach of fiduciary duty against Fingersh and Blitt was their decision about the percentage of warrants to authorize.

11. The Fox Family based the claim about the "maximum" amount of their exposure as members of the LLCs on allegations that Fingersh told them the NPAs would be marketed and sold by the LLCs within two years, thus limiting the Fox Family's expected capital calls to their share of debt service, carrying costs, and other LLC expenses over two years to roughly $2,400,000. These allegations were among many rejected by the Judgment's rejection of the Fox Family's other affirmative defenses and counterclaims, aspects of the Judgment which have not been appealed.

nority shareholders." The trial court observed that "when a transaction by a corporate director is challenged in a context where they are considered to be an interested party, generally the courts look at what is called [the] ... entire fairness doctrine." The trial court held the Fox Family's allegations created a "colorable inquiry" that the entire fairness doctrine controlled assessment of the propriety of Fingersh and Blitt's conduct. The trial court then concluded that the Transaction "was appropriate under a rule of fairness standard."

The Respondents argue that the entire fairness standard had no application here, and that the business judgment rule controlled. The Respondents thus argue that since the trial court found, and the Fox Family does not challenge, that Fingersh and Blitt comported their conduct within the protection of the business judgment rule, the Fox Family's appeal should be rejected.

The Judgment is equivocal in its conclusion about the applicability of the entire fairness standard. There is no doubt that the Judgment suggested that the standard might apply, and that the Judgment went on to determine that the standard was satisfied. Because we conclude that the evidence, viewed consistent with our standard of review, supports the trial court's conclusion that the entire fairness standard was satisfied, we need not address whether Fingersh and Blitt's decision to issue warrants in the amount of 25% of nonparticipating shareholder's shares should have been controlled by the business judgment rule.

### (i) The entire fairness standard

■■■ " 'Kansas imposes a very strict fiduciary duty on officers and directors of a corporation to act in the best interests of the corporation and its stockholders.' " [12] *Burcham v. Unison Bancorp, Inc.,* 276 Kan. 393, 77 P.3d 130, 146 (2003) (citation omitted). " 'The duty of loyalty requires that the best interests of a corporation and its shareholders take precedence over any self-interest of a director, officer, or controlling shareholder that is not shared by the stockholders generally.' " *Becker v. Knoll,* 291 Kan. 204, 239 P.3d 830, 834 (2010) (citation omitted).

■■■ However, in some instances, application of the business judgment rule insulates officers and directors from liability. Kansas courts have defined the business judgment rule as follows:

" 'The presumption that in making business decisions *not involving direct self-interest or self-dealing,* corporate directors act on an informed basis, in good faith, and in the honest belief that their actions are in the corporation's best interest. The rule shields directors and officers from liability from unprofitable or harmful corporate transactions if the transactions were made in good faith, with due care, and within the directors' or officers' authority.' Black's Law Dictionary 192 (7th ed.1999)."

*Burcham,* 77 P.3d at 147 (quoting *Unrau v. Kidron Bethel Retirement Services, Inc.,* 271 Kan. 743, 27 P.3d 1 (2001)) (emphasis added); *Kansas Heart Hospital, L.L.C. v. Idbeis,* 286 Kan. 183, 184 P.3d 866, 885 (2008). " 'The burden is on the party challenging the decision to establish facts rebutting the presumption.' " *Kansas Heart Hospital,* 184 P.3d at 885 (citation omitted).

12. The Fox Family expressly states in their brief that "Bancshares is a Kansas corporation and thus Fingersh's and Blitt's duties as directors of Bancshares are governed by Kansas law." This is not disputed by the Respondents and was so found by the trial court in the Judgment.

Because the business judgment rule is a rebuttable presumption, it places the initial burden on the party challenging a corporate decision to demonstrate the decisionmaker's 'self-dealing or other disabling factor.' If a challenger sustains that initial burden, then the presumption of the rule is rebutted, and the burden of proof shifts to the defendants to show that the transaction was, in fact, fair to the company.

*Becker,* 239 P.3d at 835.

### (ii) Whether the entire fairness standard was satisfied

■ As discussed, *supra,* we have assumed, *arguendo,* that the trial court correctly concluded that the Fox Family met its burden to rebut the business judgment rule presumption, shifting the burden to Fingersh and Blitt to prove the entire fairness of the Transaction by clear and satisfactory evidence. To satisfy the burden of proving the entire fairness of the Transaction, Fingersh and Blitt were required to prove by clear and satisfactory evidence that they acted in fairness and good faith. *Becker,* 239 P.3d at 835.

> To be clear and satisfactory, evidence should be 'clear' in the sense that it is certain, plain to the understanding, and unambiguous, and 'satisfactory' in the sense that it is so believable that people of ordinary intelligence, discretion, and caution may have confidence in it. Clear and satisfactory evidence is not a quantum of proof, but rather a quality of proof.

*Barbara Oil Co. v. Kansas Gas Supply Corp.,* 250 Kan. 438, 827 P.2d 24, 32 (1992).

" 'The entire fairness standard is exacting and requires judicial scrutiny regard-

ing both fair dealing and fair price.' " *Burcham,* 77 P.3d at 149 (citation omitted). "Fair dealing questions when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Welch v. Via Christi Health Partners, Inc.,* 281 Kan. 732, 133 P.3d 122, 143 (2006). " 'Fair price assures the transaction was substantively fair by examining 'the economic and financial considerations.' " *Valeant Pharmaceuticals Intern. v. Jerney,* 921 A.2d 732, 746 (Del. Ch.2007) (citation omitted). " 'However, the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness.' " *Emerald Partners v. Berlin,* 787 A.2d 85, 97 (Del.2001) (quoting *Weinberger v. UOP, Inc.,* 457 A.2d 701, 711) (Del.1983).[13]

> The two components of the entire fairness concept are not independent, but rather the fair dealing prong informs the court as to the fairness of the price obtained through that process.... The court does not focus on the components individually, but determines entire fairness based on all aspects of the entire transaction.

*Valeant,* 921 A.2d at 746. " '[A] showing that the action taken was as though each of the contending parties had in fact exerted its bargaining power against the other at arm's length is strong evidence that the transaction meets the test of fairness.' " *Kahn v. Lynch Communication Systems, Inc.,* 638 A.2d 1110, 1115 (Del.1994) (quoting *Weinberger,* 457 A.2d at 709–710 n. 7).

---

**13.** "Kansas courts have a long history ... of looking to the decisions of the Delaware courts involving corporation law, as the Kansas Corporation Code was modeled after the Delaware Code." *Welch v. Via Christi Health Partners, Inc.,* 281 Kan. 732, 133 P.3d 122, 143–44 (2006) (citation omitted).

The Fox Family contends Fingersh and Blitt failed to sustain their burden to demonstrate entire fairness. They complain that the trial court's contrary conclusion is erroneous because four related factual findings made by the trial court are not supported by the evidence. The factual findings to which the Fox Family objects are at paragraphs 29, 30, 39, and 41. We conclude that each of the contested factual findings is supported by the evidence.

### Paragraph 29

29. The warrant proposal was made following consultation with Mr. Degen and the Holding Company's outside counsel, banking attorney Stan Johnston. Mr. Fingersh testified that the "professionals" "came up with the percentage, and I looked at it after they were finished."

This finding was supported by Fingersh's testimony at trial that he consulted with Stan Johnston ("Johnston"), outside corporate counsel, and Richard Degen ("Degen"), Chief Financial Officer of the Bank, and asked them to formulate a plan including the details of the warrant transaction, and requested that they put together a proposal. Fingersh added that the intent behind the warrants was "to ensure fairness in the transaction" because if everybody participated, no warrants would issue and nobody's position would change. In discussing the 25% factor on re-direct, Fingersh stated that the professionals "came up with the percentage, and I looked at it after they finished, and that's the metric I used."

The Fox Family claims that Fingersh testified that the professionals only came up with a 20% dilution rate and that there was no evidence why Fingersh increased the rate to 25%. That assertion is contrary to the evidence. Fingersh testified that he confirmed the 25% rate but did not create it. He testified that the professionals first arrived at a 20% rate and that he did not know "how it got from 20 to 25."

The Fox Family argues that neither Degen or Johnston confirmed Fingersh's testimony that they were the source of the dilution factor. This assertion is of no consequence to our determination that the trial court's finding that the rate of dilution had been recommended to Fingersh was supported by substantial evidence. Fingersh's testimony did not require corroboration to be accepted by the trial court as credible.

### Paragraph 30

30. The 25% factor set forth in Exhibit 20 [the Transaction memorandum] represented a choice for the participants between compensation for their further contribution or a risked dilution of their shares should they opt not to contribute. That figure seems reasonably fair in that it represents roughly the same amount of dilution that would occur if $40 million had been invested by an outside investor, in that it represented roughly 25% of the Bank's book value at that time.

The Fox Family challenges the evidentiary support for the second sentence of Paragraph 30. We conclude the second sentence of this factual finding is supported by the evidence. Fingersh testified that the 25% dilution rate seemed reasonable because:

[I]t was two-thirds of the amount of the risk.... [T]he amount of the dilution was two-thirds of the amount at risk in buying it. It was also the approximate amount of the dilution, the same percentage amount of the dilution, as if somebody invested——a third party invested $40 million in the bank. That turned out to be, in the ballpark, the same amount.

On re-direct, Fingersh similarly explained that if the Bank found somebody who would buy $40 million worth of new stock that would have effectuated a dilution of everybody's percentage by approximately 25%, just in percentage, not in terms of money. Fingersh also testified that he made a comparison of the cost to participating and taking on the risk versus the cost of not participating and having the warrants issued and found the costs to be "roughly the same." Similarly on re-direct, Fingersh explained "[the shareholders] were at risk if they got in the deal to the same extent they were diluted if they didn't."

The Fox Family argues the trial court's finding was incorrect because if an outside investor purchased $40 million of stock its effect would not have been comparable to the effect of 25% dilution because although an outside investor's purchase would have reduced a shareholder's piece of the pie, it would have resulted in a bigger pie by increasing the Bank's book value. Thus, according to the Fox Family, there would be no overall loss of value. The Fox Family argues that in contrast, the 25% dilution rate threatened for nonparticipation in the Transaction would have diluted the value of their interest from $22 million to $16.5 million because it would increase the number of shares held by participants while only minimally increasing the Bank's book value thereby decreasing the overall value of shares. The Fox Family argues that Fingersh's testimony confirmed their position, as Fingersh testified that if an outside investor bought $40 million of new stock it would result in an increase in the net value of the bank by that amount and that as a result relative shareholder posi-

tions might decrease, but the overall value of their holding would remain the same.

We find the Fox Family's emphasis on the second sentence of Paragraph 30 to be unavailing. Viewed from the perspective of our standard of review, the second sentence is supported by the evidence, notwithstanding the Fox Family's effort to point out contrary evidence. "'On appeal it is not the function of the appellate court to weigh conflicting evidence, pass on the credibility of witnesses or redetermine questions of fact. The reviewing court is concerned only with the evidence which supports the trial court's findings and not with the evidence which might have supported contrary findings.'" *Newton v. Hornblower, Inc.*, 224 Kan. 506, 582 P.2d 1136 (1978) (citation omitted).

Moreover, the premise underlying the Fox Family's complaint with Paragraph 30 is flawed. The Fox Family inaccurately presumes that the percentage of warrant issuance must bear a direct relationship to the risk shareholders are being asked to undertake.[14] Yet, they offer no authority to support this position. In fact, logic suggests that in order for warrant issuance to incentivize performance (an objective as to which the Fox Family expresses no animus), the risk of nonparticipation must exceed to some meaningful degree the risk of participation. Whether that disparity can be "objectified" by a formula is immaterial. It is only material that the disparity appears reasonably fair. Having conceded that incentivizing participation by all Holding Company shareholders was an appropriate objective, the Fox Family cannot now be heard to complain that the 25% rate of incentive suggested by Fingersh and Blitt was unfair merely because

14. The Fox Family relies on Fingersh's testimony answering in the negative to the question, "Did either the existence of the warrants or the price of the warrants or the number of the warrants bear any relationship to the risk that you were suggesting shareholders take on?"

neither could explain, with precision, how the rate "tied" to the risk of participation. This conclusion is particularly appropriate given the fact that the Fox Family has not in any manner suggested what they believe would have been a reasonably fair rate of warrant issuance, commensurate with the objective of incentivizing participation. They appear instead to have adopted the myopic strategy of challenging whether the 25% rate was proven to be entirely fair, disregarding their concession that an incentivizing mechanism of some sort was wholly appropriate.

### Paragraph 39

39. Obtaining a formal fairness opinion from an investment bank would have been very expensive and may have been impracticable under the time pressures of the imminent FDIC exam, and the directors believed it to be unnecessary because all shareholders were to be treated equally under the proposal.

This finding is supported by the record. Jeff Wheeler, president of the Bank in 2008, testified that the FDIC examination was scheduled in May 2008. Fingersh's April 14, 2008 Memorandum to the shareholders of the Holding Company proposing the Transaction reflects the urgency of action stating, "We will have to move fast on this plan. It must be closed not later than May 15." Fingersh testified that the proposal had been made to all shareholders on the same terms and all shareholders had to be treated the same.

The Fox Family argues that the trial court's factual finding is erroneous because "the genesis of the Transaction was in February 2008," and thus several months before the "formal" proposal, affording time to conduct a formal fairness evaluation. However, the Fox Family offers no evidentiary support for their assertion, as they do not guide us to any place in the record on appeal where this evidence was before the trial court. The Fox Family also argues that Degen testified that he did not consider $250,000 to be a material expense, suggesting that Degen's testimony related to the cost of a formal fairness evaluation. In fact, Degen was not testifying about the cost of a formal fairness evaluation, but was testifying about the initial estimated (albeit erroneous) impact of the warrant transaction on the Bank's earnings provided by the Bank's outside accountants.

The Fox Family's complaint about Paragraph 39 is also without merit for the reason that it mistakenly presumes that a formal fairness opinion is required to establish entire fairness. "Although [entire fairness] requires that corporate directors evaluate the propriety of a given transaction on the basis of a full complement of information, it does not require that they seek a formal fairness opinion." *Oberly v. Kirby*, 592 A.2d 445, 472 (Del.1991) (noting that while in some situations a formal opinion may be helpful, in others, it will not significantly amplify the information already available to directors).

We are mindful that the Fox Family relies on *Baldwin v. Bader*, 585 F.3d 18 (1st Cir.2009) for the proposition that the mere offering of the same terms to all shareholders is not in and of itself dispositive of entire fairness. In *Baldwin*, Baldwin, the only shareholder in the Company who was not also a director, claimed that the other six shareholders, who were also directors of the Company, breached their fiduciary duties by issuing compensatory shares in two separate transactions to shareholders in exchange for their agreements to provide personal guaranties for loans made to the Company. *Id.* at 19. Baldwin's stake in the Company was diluted due to his choice not to provide a guaranty in each of the transactions. *Id.*

The district court ruled on summary judgment that the directors were liable on the second transaction but not the first. *Id.*

On appeal, the First Circuit noted that although Delaware law provides ambiguous guidance about how fairness is determined and the relationship of fair price to other fairness factors, "it gives weight depending on the circumstances to such variables as emergency circumstances ... and to the fact that benefits accruing to the directors as shareholders are also made available to other shareholders on equal terms." *Id.* at 22. The court noted that Baldwin had the same opportunity to acquire shares but that the directors still had a duty of care to seek a fair valuation—"to avoid overpaying and thereby diluting unnecessarily other stockholders' interests." *Id.* The court found that the directors did not breach their duty of care with respect to the *first* transaction noting that (1) there was no easy way to determine a perfect compensation formula and there was a basis for fearing that the Company was insolvent and had a negative forced liquidation value; and (2) that, in theory, they could have obtained an outside consultant but that would have cost money and the Company was operating on a shoestring, time was of the essence/they were operating in emergency conditions, if all shareholders gave guaranties there would be no dilution and price would not matter, and there was no assurance that the loan would be provided without guaranties from all of the shareholders. *Id.* at 23–24. The circumstances involved in the first transaction in *Baldwin* bear striking similarity to the facts before us, and actually serve to reinforce the trial court's judgment that entire fairness was demonstrated here.

As to the second transaction in *Baldwin,* the First Circuit court noted that the Company's financial situation had improved when the directors voted to increase both their loan and their line of credit, and that the Company was no longer on the verge of collapse. *Id.* at 24. Yet, the same compensation formula had been used for the second transaction as in the first transaction. The court found for a variety of reasons that the directors had not established entire fairness in using the same formula for the second transaction in light of improved conditions. *Id.* In this limited context, the court observed that the directors were not freed from their duty to value compensation fairly merely because the second transaction was offered to all shareholders. *Id.*

Though *Baldwin* involves a similar factual scenario as is before us, it does not hold that offering the same deal to all shareholders is irrelevant to establishing entire fairness. More to the point, *Baldwin* does not assist the Fox Family because the trial court did not find in Paragraph 39 that Fingersh and Blitt established entire fairness merely because the same deal was offered to all shareholders. The trial court simply found that the fact the deal had been offered to all shareholders was relevant to excuse securing a formal fairness opinion-itself not an essential requirement to establishing entire fairness.

### Paragraph 41

41. Mr. Fingersh (and Mr. Blitt) also reasonably relied upon the advice provided by Mr. Johnston that the warrant issuance was "fair" in its treatment of all shareholders.

This finding was also supported by the evidence at trial. Fingersh testified that he consulted with Johnston regarding the fairness and legality of the warrant proposal prior to the close of the transaction.

The Fox Family does not argue that Fingersh's reliance on Johnston was unreasonable or unwarranted. The Fox

Family argues only that Fingersh and Blitt could not meet their burden to demonstrate entire fairness without evidence that the Transaction was reviewed by a disinterested third party. The Fox Family claims Degen and Johnston were not disinterested third parties because Degen was the Bank's CFO and Johnston was a partner in a law firm once headed by Fingersh. Appellants cite no authority for the proposition that directors cannot establish entire fairness if they have relied on advice from professionals who are not disinterested. Nor do they explain how the advice from Degen and Johnston was tainted by their supposed "interest." The trial court's finding that Fingersh reasonable relied on Johnston's advice about the fairness of the Transaction is supported by the evidence, and is not meaningfully challenged by the Fox Family. In fact, the Fox Family conceded at oral argument that there is no authority to suggest that entire fairness can only be established by proof that self-dealing directors secured truly independent advice and guidance on critical transaction terms. Though evidence that self-dealing directors secured independent guidance may be relevant, it is neither self proving of entire fairness, nor of the lack of entire fairness in its absence. *See, e.g., Kahn v. Tremont Corp.,* 694 A.2d 422, 428 (Del.1997) (in self-dealing transaction, use of well functioning committee of independent directors may shift the burden of persuasion to complaining shareholder, but entire fairness standard remains applicable).

In light of the foregoing discussion, we conclude that the four factual findings contested by the Fox Family are each supported by the record. These findings combine with other findings made by the trial court (and as to which no objection has been registered by the Fox Family) to support the trial court's conclusion that the percentage of the warrant issuance settled upon by Fingersh and Blitt met the entire fairness standard. Notably, the trial court found:

9. The Bank was one of many ventures in which these families participated together over thirty years. These included commercial real estate (such as Oak Park Mall and Eastland Mall); other banks (such as Oak Park Bank); and residential real estate.

11. During the parties' long history of being investment partners, the transactions by the investment entities have been consummated without formal fairness opinions, other special governance processes, or the use of outside investment bankers to opine on the transaction for the benefit of minority shareholders.

18. The owners of the Bank, including Mr. Fox, unanimously agree that stabilizing the Bank in advance of the FDIC examination would benefit all Holding Company shareholders, and doing nothing was not an option.

25. As an incentive to the participating families ... Mr. Fingersh proposed that the Holding Company issue warrants to all participants, allowing those families "on a pro rata basis and without additional consideration, to acquire stock [in the Holding Company] equal to 25% of the stock owned by the non-participating shareholders."

27. Prior to Mr. Fingersh circulating his Memorandum, he had Mr. Degen work with the Holding Company's outside counsel and independent accountants to create a mechanism for the warrants that would be offered to all shareholders on an equal basis.

33. Participation in the LLCs (and receipt of warrants) was offered on equal terms to all shareholders of the Holding Company. ***Mr. Fingersh and Mr. Blitt,***

*as Holding Company directors, stood to gain no financial or other benefit differently from any of the Holding Company shareholders.*

34. In authorizing the sale of loans and the issuance of warrants, the directors of the Bank (including several independent directors), and *the directors of the Holding Company acted on an informed basis, in good faith, and in the honest belief their actions were in the best interests of the Bank and the Holding Company, respectively, and all of the Holding Company shareholders.* From the Holding Company directors' viewpoint, the entire LLC transaction was intended to stabilize the Bank to the benefit of all of the shareholders.

40. None of the participating shareholders, including Mr. Fox, asked for any outside confirmation of the fairness of the transaction.

48. Mr. Fox admits that he did not ask for a fairness opinion, or suggest that special governance was required for the deal at any time prior to December 2011. Nor did Mr. Fox complain about the actual dilution factor used in the transaction, prior to his attempts to withdraw his family from the deal.

96. The Bank failed in October 2010 due to an economic and real estate climate "far worse than anybody had thought was going to happen," and one that could not have been predicted by any of the shareholders or directors. And Mr. Fox testified that Messrs. Fingersh, Blitt and Copaken were not trying intentionally to lose his money (or theirs).

106. In a pleading filed nine days after the trial, the Fox Family officially withdrew several affirmative defenses, as well as dozens of "factual" allegations regarding purported "misrepresentations," "omissions," and other wrongful acts. . . . The withdrawn factual "allegations" included purported misrepresentations and omissions regarding: who had agreed to participate in the transaction; the appropriateness of the remedy to stabilize the Bank; and the financial position of the Bank; the net worth of the other participating families; and the need for and propriety of capital calls. (Emphasis added.)

We are thus persuaded that the trial court's collective factual findings support its legal conclusion that:

Obviously Messrs. Blitt, White, Fingersh, Copaken, and Fox are extremely sophisticated businessmen that understand the basics of commercial real estate transactions. Also, these people have known each other and have invested with each other for over 30 years. All of these participants have made significant amounts of money from investments that they have participated in together. All of the parties in this case are family members or friends. Every one of them knew what they were doing and certainly understood the marketplace. *In a contractual sense, the Court finds that the alleged misrepresentations were more in the nature of statements, opinions, or predictions as opposed to actual factual misrepresentations. Also the Court cannot find any evidence that supports any kind of specific intent to misrepresent.*

The seven families that owned virtually all of the stock in the Bank faced a difficult situation with few good options and doing nothing was not one of them. *Based upon the uncertainty of the times and the nature of commercial real estate, this transaction was appropriate under a rule of fairness standard.* It is extremely difficult to accurately evaluate commercial real estate in a marketplace that is declining. In this

circumstance, this decline became an eventual collapse of the real estate market.

(Emphasis added.)

The Fox Family makes an additional argument in their Brief that Fingersh and Blitt failed to prove that the information they provided about the Transaction was complete and accurate and that Fingersh and Blitt were guilty of misrepresentations and omissions pertaining to the acquisition price of certain NPAs above market price and risks or potential loss from the Transaction.

The record reflects that nearly identical allegations in the Fox Family's last amended answer and counterclaims were withdrawn by the Fox Family in a pleading filed nine days post-trial. We will not allow withdrawn allegations from a pleading to be resurrected on appeal as somehow relevant to demonstrating trial court error. *River City Development Associates, LLC v. Accurate Disbursing Co., LLC,* 345 S.W.3d 867, 873 (Mo.App. E.D. 2011) (stating that "an appellate court will not convict a trial court of error on an issue which was not before it").

In any event, the trial court made the following factual findings in its Judgment:

52. In June 2008, in response to another letter from Mr. Fox, Mr. Fingersh stated to Mr. Fox that "[o]bviously I have no crystal ball, but … I wouldn't think … that the exposure could be more than 20 percent plus the cost of the carry." The Court finds this statement to be a non-actionable prediction as to future events based on Mr. Fingersh's "30–year history of investing and working at the bank· and real estate lending." There is no evidence that Mr. Fingersh did not believe the statement at the time he made it.

107. The Fox Family also withdrew their allegations regarding their "mis-taken" "belief" as to the acquisition price of the NPA being at "market value," as well as the potential loss that they might suffer on the NPAs.

The trial court then concluded:

[T]he alleged misrepresentations were more in the nature of statements, opinions, or predictions as opposed to actual factual misrepresentations. Also, the Court cannot find any evidence that supports any kind of specific intent to misrepresent.

Fox Family does not expressly challenge these findings or conclusions on appeal.

In summary, we conclude the trial court's finding that the Transaction met the entire fairness standard is supported by substantial evidence. As a result, the affirmative defense and the related counterclaim asserting a breach of fiduciary duty by Fingersh and Blitt in their capacities as directors and controlling shareholders are without merit.

Point One is denied.

### Points II and III

In their second point, the Fox Family claims that the trial court erred in finding that the their breach of fiduciary duty counterclaim is time barred by the two year statute of limitations and did not relate back to the same transaction alleged in the Fox Family's original counterclaim filed in September 2010. In their third point, the Fox Family claims that the trial court erred in denying their breach of fiduciary duty counterclaim and defense based upon the doctrines of waiver and ratification as it was not supported by substantial evidence in that those doctrines require full knowledge and purposeful conduct, neither of which was present in this case. Both points are rendered moot by our determination that the related affirmative defense (which relied for its proof on

evidence identical to that required to establish the counterclaim) was not supported on its merits by the evidence.

Points Two and Three are denied.

## Point IV

■ In their fourth and final point on appeal, the Fox Family claims that the trial court erred in striking their jury demand because the jury waiver in the operating agreements does not apply to the breach of fiduciary duty counterclaim against Fingersh and Blitt as they are not parties to the operating agreement in their individual capacity or as directors or controlling shareholders of the Holding Company. We disagree.

### *Standard of Review*

In addition to the standard of review set forth in point one, our review of this point on appeal requires us to interpret the jury waiver provision in the Operating Agreements. Contract interpretation involves an issue of law, reviewed *de novo*. *Fedynich v. Massood*, 342 S.W.3d 887, 890 (Mo. App. W.D.2011).

### *Analysis*

■ "The right to a trial by jury is constitutionally guaranteed." *Malan Realty Investors, Inc. v. Harris*, 953 S.W.2d 624, 625 (Mo. banc 1997) (citing Mo. Const. art. I, section 22(a)). "However, the right to a civil jury trial is a personal right and, therefore, it may be waived." *Id.* "Our courts have held that a party may contractually relinquish fundamental and due process rights." *Id.* at 626. "If the contract terms are unequivocal, plain, and clear, the court is bound to enforce the contract as written." *Id.* at 626–27.

The LLCs petition and amended petition indicated "Jury trial waived by agreement" in the caption. The Fox Family asserted on each of their answers to the petition and amended petition, "Jury trial demanded." Per the record on appeal, in March 2012, the LLCs' motion to strike the Fox Family's jury demand was granted by summary order. Thus, on the first page of the Judgment, the trial court states that "it was agreed by all the parties to waive jury trial." The Fox Family claims that this "finding" was not supported by substantial evidence.

Both parties reference Section 9.7 of the LLCs' operating agreements,[15] which provides:

> Section 9.7. Waiver of Jury Trial. To the fullest extent permitted by applicable law, the parties hereto waive trial by jury in any action, proceeding or counterclaim brought by any party(ies) against any other party(ies) on any matter arising out of or in any way connected with this agreement or the relationship of the parties created hereunder.

It is undisputed that Fingersh and Blitt are both parties to and executed the operating agreements, although not in their individual capacity or as directors or controlling shareholders of the Holding Company. Fingersh and Blitt are identified as the managers of the LLCs in the operating agreements. It is also undisputed that the Fox Family's counterclaim for breach of fiduciary duty is a matter "arising out of or ... connected with [the operating agreement] or the relationship of the parties created hereunder."

The Fox Family nonetheless claims that the waiver of jury trial in the operating

---

**15.** The exhibit included in the LLC's appendix is the operating agreement of HCI Investors, LLC. Both parties rely on it for the excerpt containing the alleged waiver of jury trial. Fox Family asserts that each of the LLCs' operating agreements contain a waiver of jury trial and makes no claim that the same provision was not included in the operating agreements for the other LLCs.

agreements is limited by its express terms to disputes between the "parties hereto," and that because neither Fingersh nor Blitt signed the operating agreements in the capacity in which they were sued in the counterclaim, the jury waiver did not apply.

We disagree. By the express language of the jury waiver, the Fox Family unequivocally waived their right to a jury trial as to "any matter arising out of or in any way connected with this agreement or the relationship of the parties created hereunder." The breach of fiduciary duty counterclaim is inextricably interwoven with the LLCs and the relationship of the parties created by the operating agreements. The express language of the jury waiver applies to claims "against any … party(ies)." Fingersh and Blitt were parties to the operating agreements. The jury waiver language in no ways limits the reference to "parties" to the capacity in which the operating agreements were executed. *Cf. Tracinda Corp. v. Daimler-Chrysler AG*, 502 F.3d 212, 225 (3d Cir. 2007) (when a valid contractual jury trial waiver applies to signatory corporation, the waiver also applies to non-signatory directors and officers seeking to invoke the waiver as agents of the corporation); *In re Credit Suisse First Boston Mortg. Capital, L.L.C.*, 273 S.W.3d 843, 851 (Tex.App.2008) (where agency is undisputed, we may infer the parties' intent that their jury waiver include the acts of their agents).

Point Four is denied.

## Conclusion

We affirm the trial court's judgment.

All concur.